## United States District Court
## District of Nebraska

| | |
|---|---|
| **Cory and Cheryl Ditter, Husband and Wife, Individually and as next of kin to Chase Ditter, on behalf of Nathan and Jackson Ditter as next of kin of Chase Ditter, and as Co-Personal Representatives of the Estate of Chase Anthony Vane Ditter**<br>**Plaintiffs,**<br><br>**v.**<br><br>**City of Columbus, a political subdivision; Jodi Hefti, in her individual capacity, and Kyle Blunck, in his individual capacity,**<br>**Defendants.** | **Case No.**<br><br>**4:26-cv-3028**<br><br><br><br>**Complaint**<br>**(42 USC §1983)**<br>**(Wrongful Death)** |

### Introduction

1.      Chase Ditter was a seventeen-year-old high school student at Columbus High School. School officials and School Resource Officer Jodi Hefti knew that Chase suffered from depression, which sometimes manifested in sadness, emotional distress, and suicidal thoughts. With the support of his family, Chase continued to work hard to overcome these challenges. He ranked in the top ten percent of his class, earned a Chancellor's Tuition Scholarship at the University of Nebraska–Lincoln, and was accepted into the cybersecurity accelerated master's program at the Rochester Institute of Technology in New York where he planned to attend after graduating.

2.      On February 6, 2024, Chase became depressed while at school and left campus, walking through a nearby field & residential neighborhood toward his home.  Chase

1

would be met on the way by His father, Cory Ditter—who had repeatedly helped Chase through prior mental health crises.

3.       School Resource Officer Jodi Hefti followed Chase while summoning additional officers, including Columbus Police Officer Kyle Blunck. Upon reaching the Ditter home, the officers entered the residence without a warrant and against the expressed wishes of Chase's father, Cory Ditter, who wanted to calm and protect his son.

4.       Within moments of entering the home, Officer Hefti escalated the encounter by aiming and firing her Taser at Chase while he stood next to his father holding a kitchen knife at his side. The Taser deployment caused Cory Ditter to fall and caused Chase to move toward his father and toward the stairway to his basement bedroom. After observing these movements for only a moment, Officer Blunck fired his weapon at Chase at least nine times until Chase fell to the ground  and died in a pool of blood within feet of his father.

5.       Less than thirty seconds elapsed between officers entering the Ditter home and shooting the teenager dead.

**Parties and Jurisdiction**

6.       Chase Anthony VaneDitter is the deceased son of Cory and Cheryl Ditter. He died intestate on February 6, 2024 at the age of 17, leaving behind his parents and two younger siblings, Nathan and Jackson.

7.       Cory and Cheryl Ditter ("the Ditters") are the natural guardians of Chase Ditter. The Ditters are also the Co-Personal Representatives of the Estate of Chase Ditter and authorized to bring suit on his behalf.

8.       The Ditters sue on behalf of the estate to vindicate their son's rights pursuant to 42 U.S.C. §1983 and for his wrongful death pursuant to *Neb Rev Stat* § 25-1401.

9.      As Chase Ditter's next of kin, the Ditters sue on their own behalf and on behalf of Nathan and Jackson Ditter, for Chase's wrngful death pursuant to *Neb Rev Stat* § 30-810.

10.      The City of Columbus is a Nebraska Political Subdivision subject to suit in accordance with the Nebraska Political Subdivision Tort Claims Act, *Neb Rev Stat* §13-902 *et seq.* Notice was properly served on the City of Columbus by letter dated January 31, 2024, a copy of which is attached hereto and marked as Exhibit 'A.' The City of Columbus did not respond to the claim within six months and Plaintiffs withdrew the claim.

11.      Jodi Hefti is employed by the City of Columbus as a police officer and school resource officer at Columbus High School. At all relevant times, she acted under color of law. She is sued in her individual capacity.

12.      Kyle Blunk was employed by the City of Columbus as a police officer. At all relevant times, he acted under color of law. He is sued in his individual capacity.

13.      All material events alleged herein occurred in Columbus, Platte County, Nebraska.

14.      This Court exercises federal question jurisdiction pursuant to 28 U.S.C. §§1331 because Plaintiffs bring claims pursuant to 42 U.S.C. §1983.  The Court properly exercises jurisdiction over Plaintiffs' state law claims pursuant to 42 U.S.C. § 1367.

## Facts

### a)  *Chase's Mental Health and the Role of Father*

15.      Chase suffered from Major Depressive Disorder. School officials were aware of this diagnosis. In August 2023, following concerns raised at school regarding potential

self-harm, Chase was transported to the Columbus Police Department. Following an interview, Chase was released to his parents. In October 2023, school officials implemented an Individualized Education Plan for Chase pursuant to Section 504 of the Rehabilitation Act of 1973.

16.     Chase's father, Cory, responded to the Columbus Police Department in response to the August, 2023 incident. Hefti learned from Cory's involvement that day that Cory had a close relationship with his son and was able to assess when Chase presented a danger to himself. During the February incident, Cory was able to persuade officials, including Hefti, that he could keep his son safe and that Chase did not need to be placed in emergency protective custody. Cory subsequently communicated with school officials regarding Chase's mental health.

17.     Chase's mental health had never caused him to assault, threaten to assault, or commit any act of violence toward his fellow students, school staff, or others. He had never been suspended from school, or the subject of any criminal charges or disciplinary proceedings related to violence.

### b)  Failure to Deescalate and Unlawful Entry of Home

18.     On the day of his death, Chase attended classes at Columbus High School. After an interaction with a teacher, Ms. Plance, Chase experienced emotional distress. While still in class, Chase made comments about self-harm

19.     After class, Ms. Plance reported the classroom incident to school administrators and requested a meeting with Chase and his parents. It was suggested that

Chase be removed from her class on an ongoing basis. Ms. Plance advised that she was familiar with Chase and his family and did not believe removal from her class was necessary.

20.      After the dispute, Chase attended a portion of his next class before walking out of the school and toward his home located approximately less than a half mile from the school. He was carrying his bookbag with a strap over one shoulder.

21.      Officer Jodi Hefti followed in her marked patrol car and then parked and followed on foot near Chase as he walked on a neighborhood sidewalk toward his home.

22.      As they walked, Chase did not verbally assault Hefti.

23.      As they walked, Chase did not present a serious risk of physical injury to Hefti.

24.      As they walked, there was no reason to believe Chase was armed.

25.      As they walked, Officer Hefti did not express concern for Chase's emotional state and did not offer assistance or support related to his mental health.

26.      As they walked, and after briefly stopping, Officer Hefti reached toward Chase from behind. When Chase turned, his bookbag swung away from his shoulder, and Officer Hefti responded, "You better not hit me with that or you'll be in trouble," escalating the interaction rather than offering assistance.

27.      While walking behind Chase, Officer Hefti radioed dispatch and requested that Chase's father be contacted

28.      In response, Chase initially and calmly told Officer Hefti to leave him alone and to keep her hands off him he was going home. After Officer Hefti continued to pursue him, Chase stated that he would fight a police officer if he had to in order to be left alone.

Officer Hefti responded by stating that she "had more officers coming," escalating the encounter despite Chase's otherwise calm and non-combative demeanor.

29.     When Officer Hefti radioed for backup, she did not convey that Chase was experiencing a mental health crisis, that he appeared emotionally distressed, or that his statements occurred only after she initiated contact with him on the sidewalk and continued to pursue him despite his requests to be left alone.

30.     Cory Ditter arrived in his vehicle as Chase was still a block or two from his home. After parking his car and meeting Chase, Cory walked in the presence of Chase for about sixty seconds to their home. Despite the presence of Chase's father, Hefti continued to follow.

31.     When Chase, and then his father, reached the garage door and nearby keypad used to open the door, Chase activated the keypad. and walked toward the interior door providing ingress to the kitchen area. Chase then activated the button causing the garage door to lower, and disappeared out of sight.

32.     Cory, still in the garage, watched Hefti interfere with the garage door closing by placing her foot in front of the sensor, causing the door to reverse directions.

33.      After the garage door raised, Cory addressed Hefti and Officer Jamie Levander, who had just arrived. Knowing Chase just needed separation from Hefti and Levander and that he could calm him down, Cory pleaded with the officers to let him go in and talk to Chase, making clear he did not wish them to come into the home.

34.     Hefti again contemptuously responded with callousness and disrespect, stating "Good luck with that."

35.     Cory then followed Chase into the kitchen and observed him standing near a counter and his bookbag on the counter.

36.     As Hefti and Levander then turned and began walking through the interior garage door, Cory put his hand up and said, "Stop," again expressing refusal to allow the officers' entry.

37.     At that time, the officers had observed nobody in possession of a weapon, nor any effort by Chase to commit any act of violence toward himself or others.

38.     They had observed no circumstances providing a basis to believe anyone was seriously injured or threatened with immediate serious injury.

39.     Nonetheless, Hefti, followed by Levander, worked past Cory as he stood in the doorway and entered the home.

40.     Around that time, a third officer, Kyle Blunck, had arrived and followed Hefti and Levander inside the home.

### c) Escalation and Negligent Use of Taser

41.     The interior garage door opened into the kitchen of the Ditter's well-kept home. To the right was an island and, further to right, a countertop and oven. There was a butcher block on the countertop. To the left, the kitchen opened up to a living area, main floor bedrooms, and a stairway leading to Chase's basement bedroom.

42.     The officers' illegal entry of the home escalated the situation.

43.     After entering the home, Hefti and Levander observed that Chase had taken a knife from a nearby butcher block and was holding the knife by his side. Chase's father was standing next to him, well within arm's reach.

44.    Chase was not screaming or acting aggressively.

45.    Chase had not threatened his father, or anyone, with the knife, or with anything. He had neither verbally assaulted his father nor the police.

46.    Chase had not brandished the knife.

47.    When Hefti and Levander entered the home, they observed a depressed teenager standing next to his father and holding a kitchen knife. The father was calm, attempting to console Chase, his son. Chase demonstrated no hostility toward his father.

48.    In light of Chase's comments while at school and his history of depression, it appeared he held the knife to express an intention to harm himself.

49.    After entering the home, Officer Levander gave warning to Blunck that Chase had a knife.

50.    Hefti took a position between the island and living area, about twenty feet from Chase and his father. She began issuing strong verbal commands to Chase, including commands that he drop the knife.

51.    Hefti aimed her Taser at Chase without providing a verbal warning of either her intended use of the Taser, or of the potential for use of deadly force by her, or by Officer Blunck who was positioned around the corner out of Chase's view, or by Officer Levander.

52.    Blunck knew or should have known that use by Hefti of her Taser would cause chaos by Chase losing control of his is muscles while holding a knife near his father, or by one or more darts hitting Cory instead of Chase.

53.    Blunck did nothing to discourage Hefti from using her Taser.

54.     As Hefti aimed her Taser and issued commands to the teenager suffering a mental health crisis, Officer Blunck unholstered his loaded firearm and took a position in the area of the doorway, still around a corner from where Chase stood with his father.

55.     Blunck's position prevented him from having a visual of Chase and his father.

56.     As Cory stood next to his son, facing him, Hefti aimed her Taser at Chase, creating a dot of light on Chase's chest.

57.     When Cory observed the target light, he turned toward Hefti and raised his hand to protect Chase.

58.     Hefti fired her Taser toward Chase and his father.

59.     Tasers like the one used by Hefti have two darts. Both darts must strike a subject to activate the electrical current intended to manipulate the target's behavior. Hefti knew or should have known this.

60.     Hefti knew or should have known firing the Taser from her position toward two people standing close to one another would likely fail to accomplish the Taser's intended purpose.

61.     Hefti knew or should have known firing the Taser from her position would cause movement of Chase while holding the knife, ensuing chaos and further escalation of the situation.

62.     As was foreseeable by Hefti, one dart struck the hand raised by Cory. The other struck Chase. As a result, electrical current running between the darts disoriented Cory and caused him to begin falling away from Chase.

63.     Hefti's use of force, causing his father to fall, alarmed and scared Chase. Chase moved away from the counter.

64.    Chase's movement was toward the direction his father was falling.

65.    Chase's movement was also toward bedrooms on the main floor and stairs leading to his basement bedroom. the living room and bedrooms.

### d) Use of Excessive, Deadly Force

66.    Blunck, still positioned around the corner, did not see where the darts from Hefti's Taser landed or the initial movements of Chase or Cory they caused.

67.    Within a second or two of Hefti firing her Taser, Cory and then his son, Chase, entered Blunck's field of vision, Cory falling backwards and Chase moving in his direction.

68.    Blunck observed those movements for only a brief moment as the two entered his field of vision.

69.    During that moment, Blunck did not see Chase raise or brandish the knife. Blunck did not see the knife at all.

70.    During that moment, Blunck did not observe Chase assault either his father or the officers present. Chase had not assaulted anyone.

71.    During that moment, Blunck did not observe Chase verbally threaten to assault or otherwise harm his father, or the officers present. Chase had not threatened anyone.

72.    After a moment's observation of Cory and Chase, Blunck fired his revolver at least two times at Chase from close range.  At least one of the shots struck Chase in his torso and caused him to turn and move away from Blunck and Levander toward a patio door at the rear of the home.

73.    As Chase turned away from Blunck, Blunck then shot Chase three or four more times in the back.

SIPPLE.LAW                                    10

74.    These shots caused Chase to turn around so that he was then facing the officers.

75.    Though Chase had been shot five or six times in his torso from close range, and was armed only with a knife, Blunck fired several more rounds into Chase's body.

76.    Within ten seconds of firing the first shot, Blunck fired his revolver at least nine times into the body of Chase.

77.    Cory saw his son laying on the floor surrounded by a pool of dark blood. He cried out, "What the fuck did you do? You fucking killed him!"

78.    Chase was shot dead within thirty seconds of officers unlawfully entering the home.

79.    No officer had done anything to help Chase; they had only commanded, threatened, Tased, and killed him using a firearm.

80.    A few minutes after the shooting, a body camera depicts Hefti shrugging her shoulders in response to the incident.

81.    Another recording captures a conversation in which an officer, while driving Officer Hefti from the scene, suggested stopping at St. Isadore's church to pray. Officer Hefti declined that suggestion.

82.    The officer then stated that he was scheduled to attend training and asked whether Officer Hefti wished to accompany him to inform the group that he would not be attending. Officer Hefti agreed to accompany him and stated that she had nothing better to do.

**Damages**

83.      As a direct and proximate result of the actions of Defendants, and each of them, Chase lost his life at the age of 17; Chase's parents, Cory and Cheryl Ditter, lost the care and companionship of their son, and Nathan and Jackson Ditter lost the care and companionship of their brother. Plaintiffs sustained general damages of emotional distress, loss of personal dignity, fear, humiliation and anxiety.

84.      As a direct and proximate result of the actions of Defendants, and each of them, Chase suffered emotional trauma, pain and suffering while being threatened by Hefti as he stood with his father; while being shot multiple times by Officer Blunck; and while he lay dying on the floor of his home near his father.

85.      As a direct and proximate result of the actions of Defendants, and each of them, Chase and his next of kin lost expected wages, services and contributions of Chase; and incurred funeral expenses and other economic damages.

86.      As a direct and proximate result of the actions of Defendants, and each of them, Cory Ditter suffered emotional distress as a bystander.

87.      As a direct and proximate result of the actions of Defendants, and each of them, Chase's parents, Cory and Cheryl Ditter, lost the care and companionship of their son, and Nathan and Jackson Ditter lost the care and companionship of their brother.

**First Cause of Action**
**(Section 1983 - Unlawful Entry)**
**(Officer Hefti)**

88.      Plaintiffs incorporate all allegations made above herein.

89.      Officer Hefti entered the home without a warrant, consent or exigent circumstances.

90.    At the time Hefti entered, she had no knowledge Chase was holding a knife or any objective basis for believing anyone was seriously injured or imminently threatened with such injury.[1]

91.    Hefti entered the home knowing that Chase was suffering from his mental health, but in light of Cory Ditter's presence, had no basis to believe their involvement was necessary to protect or preserve life or avoid serious injury.

92.    Hefti entered the home without attempting to use other tactics to de-escalate the situation, including but not limited to:

    a.  Hefti did not offer to stand by while Cory attempted to calm his son;

    b.  Hefti did not seek help from mental-health professionals;

    c.  Hefti did not seek help from officers with specialized training regarding mental health.

93.    Hefti's warrantless, nonconsensual entry of the home was objectively unreasonable and violated the clearly established rights of Chase, Cory, Cheryl, Nathan and Jackson Ditter in the privacy and sanctity of their home protected by the Fourth Amendment of the United States Constitution.

94.    By entering the home against Cory's demonstrated and articulated lack of consent, Hefti acted with reckless and callous indifference to the rights of Plaintiffs, and each of them.

---

[1] See, *Case v. Montana*, 223 L.Ed.2d 382, 392 (U.S. 2026)

95.     Hefti's unlawful entry escalated the incident and violation of Plaintiffs' rights was a direct and proximate cause of Chase's death and the general and specific damages suffered by Plaintiffs, and each of them.[2]

### Second Cause of Action
### (Section 1983 - Excessive Force)
### (Officers Hefti and Blunck)

96.     Plaintiffs incorporate all allegations made above herein.

97.     Before he was Tased, shot, and killed, Chase was armed only with a knife and had not threatened harm to his father or the officers;

98.     Before he was Tased, shot, and killed, Chase did not pose an immediate threat of death to his father, who stood directly next to Chase in the absence of any conflict or tension between the two;

99.     Before he was Tased, shot, and killed, Chase did not pose an immediate threat of death or serious physical injury to officers present, each of whom took positions a safe distance from Chase and were armed with a handgun.

100.    Before he was tased, shot, and killed, Chase was not actively resisting arrest or attempting to flee. He was a teenager experiencing emotional distress who was holding a knife;

101.    Before Chase was Tased, shot, and killed, officers had no reason to believe Chase possessed a firearm, or reason to believe there were firearms present in the home;

---

[2] When an officer is called to respond to a person at risk of suicide, however, entering the house may not always be the objectively reasonable course of action to "'preserve life or avoid serious injury.'" *Case v. Montana*, 223 L.Ed.2d 382, 392 (U.S. 2026)(Sotomayor, J., concurring)(quoting *Mincey*, 437 U. S., at 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290).

102.    Hefti's unlawful entry of the home and aiming and firing the Taser constituted an objectively unreasonable use of force in light of the facts and circumstances confronting her, Chase's interest in his life, and his family's interest in his life.[3]

103.    Hefti's use of force violated Chase's clearly established rights under the Fourth Amendment of the United States Constitution.

104.    Hefti acted in reckless and callous disregard of Chase's right to be free from the use of excessive force in response to a mental health episode;

105.    Blunck's use of deadly force was objectively unreasonable use of force in light of the facts and circumstances confronting him, Chase's interest in his life, and his family's interest in his life.

106.    Blunck's use of force violated Chase's clearly established rights under the Fourth Amendment of the United States Constitution.

107.    Blunck acted in reckless and callous disregard of Chase's right to be free from the use of excessive force in response to a mental health episode;

108.    The actions of Blunck and Hefti violating Chase's constitutional rights as alleged above herein, individually and in concert with one another, were a direct and proximate cause of Chase's death and the general and specific damages suffered by Plaintiffs, and each of them.

---

[3] Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Barnes v. Felix*, 605 U.S. 73, 76 (2025); (To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment).

**Third Cause of Action**
**(Section 1983 - Interference with Familial Relationship)**
**(Hefti)**

109.    Plaintiffs incorporate all allegations made above herein.

110.    Hefti knew Chase was Cory's son, and that Cory was Chase's father.

111.    From her prior experience with Cory and Chase, and from her observations of their behavior and demeanor as Cory stood near Chase in the kitchen, Hefti knew Cory could reasonably be expected to console Chase and keep him safe.

112.    The Fourteenth Amendment protects the right of a parent to the companionship, care, custody, and management of his or her children.[4]

113.    By continuing to follow Chase and Cory to the home, by callously and contemptuously dismissing Cory's request to be left along to help his son, by unlawfully entering the home against Cory's repeatedly expressed wishes, by carelessly  aiming her Taser at Chase while his father consoled him, and by firing her Taser at Chase while he was being consoled by his father, Hefti knowingly and intentionally interfered with Cory's protected rights to parent and to protect Chase.

114.    Hefti acted in reckless and callous disregard of Cory's familial relationship with his son.

115.    Hefti's actions violating Cory's rights were a direct and proximate cause of Chase's death and the general and specific damages suffered by Plaintiffs, and each of them.

---

[4] *E.g., Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

**Fourth Cause of Action**
**(Negligence)**
**(City of Columbus)**

116.    Plaintiffs incorporate all allegations made above herein.

117.    Officers Hefti and Blunck acted at all times as agents and employees of the City of Columbus and within the scope of their duties;

118.    Officers Hefti and Blunck knew Chase Ditter suffered from mental illness and was suffering from mental illness at the time of their contact with him;

119.    Officers Blunck and Hefti owed a duty to use reasonable care when responding to the Ditter home and when attempting to protect Chase, a mentally ill teenager;

120.    Blunck and Hefti breached their duty of care in each of the following particulars;

   a.  By breaching the official policy of the Columbus Police Department to attempt means of de-escalating the situation;

   b.  By breaching the official policy of the Columbus Police Department prohibiting invading the space of a subject unless necessary to protect the officers or others;

   c.  By placing Chase in a position of peril whereby his natural and reasonable response was to escape Hefti and Levander and place himself in danger of deadly force he could not anticipate;

   d.  By escalating the situation while following Chase home by "policing" him, including treating him with callousness and threats rather than offering help;

e.  By failing to call for medical assistance and thereby acting with callous and reckless indifference to his medical needs;

f.  By unlawfully entering the home instead of allowing his father time to calm Chase;

g.  By failing to attempt to disarm Chase through communication or persuasion rather than issuing commands and threats;

h.  By using tactics reasonably expected to trigger aggressive conduct by a person who, due to medical conditions, mental impairment, situational stress, and behavioral crisis, was unable to immediately comply with officers' commands;

i.  By punitively using the Taser under circumstances making it more likely to escalate and make the situation more dangerous than to accomplish any interest in safety;

j.  By failing to warn Chase deadly force may be used;

k.  By failing to employ available tactical options other than issuing commands and threatening to Tase a person known to suffer mental illness and acting emotionally, all contrary to nationally recognized policing standards adopted by the Columbus Police Department in November, 2021.

l.  By failing to employ means other than firing nine or more deadly rounds from a loaded handgun into Chase's torso to address the threat of a depressed teenager who had never harmed anyone.

121.    The negligence of Hefti and Blunck was the direct and proximate cause of

Chase's death and the general and specific damages suffered by Plaintiffs, and each of them.

**Relief**

122.    Cory and Cheryl Ditter, and Nathan and Jackson Ditter pray for the following

relief:

a.   Judgment in their favor against Jodi Hefti for depriving him of his
constitutional rights as alleged above herein;

b.   Judgment in their favor against Kyle Blunck for depriving him of his
constitutional rights as alleged above herein;

c.   Judgment in their favor against the City of Columbus for the wrongful
death of their son resulting from the negligence of Officers Hefti and
Blunck;

d.   Compensatory damages;

e.   Economic damages;

f.   Punitive damages;

g.   Attorney's fees pursuant 42 U.SC. §1988

123.    Cory and Cheryl Ditter, as Co-Personal Representatives of the Estate of Chase

Anthony Vane Ditter, pray for the following relief:

a.   Judgment in their favor against Jodi Hefti for depriving Chase of his
constitutional rights as alleged above herein;

b.   Judgment in their favor against Kyle Blunck for depriving Chase of his
constitutional rights as alleged above herein;

c.   Judgment in their favor against the City of Columbus for his wrongful
death  resulting from the negligence of Officers Hefti and Blunck;

d.   Compensatory damages;

e.   Economic damages;

    f.   Punitive damages;

    g.   Attorney's fees pursuant 42 U.SC. §1983

### Request for Jury Trial

Plaintiffs request trial by jury of all claims alleged herein pursuant to and as guaranteed by the Amendment Seven of the United States Constitution.[5]

CORY AND CHERYL DITTER, HUSBAND AND WIFE,
INDIVIDUALLY AS NEXT OF KIN TO CHASE DITTER,
ON BEHALF OF NATHAN AND JACKSON DITTER AS
NEXT OF KIN OF CHASE DITTER, AND AS CO-PERSONAL
REPRESENTATIVES OF THE ESTATE OF CHASE ANTHONY VANE DITTER

Plaintiffs**,**

By: /s/ *Adam J. Sipple,* #20557
**S I P P L E L A W**
12020 Shamrock Plaza
Suite 200
Omaha, NE 68154
402.778-5055
adam@sipple.law
*Attorney for Plaintiffs*

By:   /s/ *Daniel H. Friedman* #22293
/s/ *Stephen A. Sael* #25970
FRIEDMAN LAW OFFICES, P.C., L.L.O.
3800 Normal Blvd., Suite 200
PO Box 82009
Lincoln, NE 68501
(402) 476-1093
ssael@friedmanlaw.com
*Attorneys for Plaintiffs*

---

[5] See, *Kartch v. EOG Res., Inc.*, No. 4:10-cv-014, 2010 U.S. Dist. LEXIS 116794, at *8 (D.N.D. Oct. 22, 2010); *Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 230 (8th Cir. 1996); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 470 (1962).



# S I P P L E | L A W

January 31, 2024

Shuraya Choat
City Clerk
2500 14th St., Suite 3
P.O. Box 1677
Columbus, NE 68602-1677
CERTIFIED MAIL

*Re:*    ***Tort Claim***
***Cory and Cheryl Ditter, Personal Representatives of the Estate of Chase Ditter***
***Date of Incident resulting in death*: February 6, 2024**

Dear Ms. Choat:

Please be advised I represent Cory and Cheryl Ditter ("the Ditters"), the natural guardians of Chase Ditter. Chase was shot dead, in his home, in front of his father, by Columbus Police Officer Kyle Blunck on February 6, 2024. This is to provide notice of the Ditter's tort claims in accordance with the Political Subdivisions Tort Claims Act, *Neb Rev Stat* §13-902 *et seq.* Such claims are advanced by the Ditters in both their individual capacities as Chase's natural guardians, and in their capacities as Co-Personal Representatives of the estate.

On the aforementioned date, Chase walked home from Columbus High School in the middle of the school day after having emotional problems caused by medically diagnosed depression and other mental disorders. School officials, including School Resource Officer Jodi Hefti, knew Chase suffered from these medical conditions and that, in the past, Chase's father was able to calm him down when he became upset. They also knew he had never been violent and had never harmed anyone. Additionally, they knew he had not threatened to harm anyone at school that day.

Officer Hefti followed Chase home, initially in her vehicle and then on foot. Officer Hefty and Chase interacted on the sidewalk as the two neared the Ditter home. Chase made it clear he wanted to be left alone by the police. Though she did not suspect that Chase was armed, she nonetheless continued to follow and engage him.

Chase's father, Cory Ditter, arrived as they continued toward the Ditter home. When they reached the home, Chase and Cory entered the garage and Chase continued into the home. Cory Ditter asked Hefti and Officer Jamie Levander, who had arrived at Hefti's request, if he could go talk to his son and told the officers not to follow him and Chase into the home through the

12020 Shamrock Plaza, Suite 200 Omaha, NE 68154    **EXHIBIT 'A'**
402.778.5055

*Tort Claim, 1 31 25*
*p. 2*

garage. Cory explained that if the officers would give him a minute, he could calm Chase down as he had in the past. Officer Hefty responded, "Good luck with that."

After Chase actuated the garage door to close, Officers Hefti and Levander stopped the garage door from closing by triggering the safety sensor and entered the garage. Officer Levander then opened the interior garage door and gained entry into the home's kitchen area, with Officer Hefti following. The officers entered the home without a warrant, consent or exigent circumstances.

Chase would be shot dead within 30 seconds of the unlawful entry.

The officers' illegal entry of the home escalated the situation. Officer Hefti positioned herself in a living room area at least twenty feet from where Chase stood next to his father, who was parenting and calming Chase. Though Chase held a knife by his side, he did not threaten anyone verbally. Contrary to the City's published statement, Chase did not brandish the knife. Nonetheless, Officer Hefti again escalated the situation by yelling commands at Chase and aiming a Taser gun at his chest. Within seconds of taking aim, Officer Hefti deployed the Taser. One Taser probe struck Chase and the other struck Cory, causing Cory to fall and Chase to move toward him while holding the knife.

Officers never warned Chase he might be shot and killed. At the time Office Hefti fired her Taser, Officer Blunck was around a corner of the entryway, out of Chase's sight. Chase was unaware Blunck had unholstered his firearm.

Though Officer Blunck had limited information, and a limited field of vision, he deployed deadly force immediately upon seeing Chase, for a split second, moving toward his father. Though the first 2 shots fired by Blunck caused Chase to move away from the officers, he fired 3 or 4 more rounds into Chase's back, causing him to turn around, again facing the officers. Though Chase had been shot 5 or 6 times and was not within arm's reach of the officers or his father, Officer Blunck fired several more rounds, twelve total, causing Chase to fall dead in front of his father, armed only with a knife.

**Chase was shot approximately 12 times, and killed, within thirty seconds of the officers' non-consensual entry of the home.**

Any circumstance the officers could hope to rely upon to justify his death occurred only after officers unlawfully entered the home and first threatened and then shot Chase and his father with a Taser.

In addition to violating Chase's rights under the Constitution by using an objectively unreasonable amount of deadly force, the officers failed to use reasonable care in the following particulars:

1)  by escalating the situation by unlawfully entering the home;

2)  by failing to warn Chase of the potential of deadly force;

3)  by failing to attempt disarming Chase through communication and persuasion;

4)  by failing to consider that due to his mental health Chase's behavior did not reflect deliberate non-compliance;

5)  by instead using tactics reasonably expected to trigger aggressive conduct by a person who, due to medical conditions, mental impairment, situational stress, and behavioral crisis, was unable to immediately comply with officers' commands; and

6)  by failing to use reasonable care by employing available tactical options other than yelling at and threatening to Tase a person known to suffer mental illness and acting emotionally, all contrary to nationally recognized policing standards adopted by the Columbus Police Department in November, 2021.

Simply, there were means other than twelve deadly shots fired, without warning, by an officer out of Chase's view, to address the threat of a depressed teenager who had never harmed anyone.

The officers' negligence was the proximate cause of Chase's death. Further, Officer Blunck willfully and maliciously assaulted Chase Ditter by continuing to employ deadly force after the threat had been sufficiently mitigated by the first two shots fired. Finally, on information and belief, the City's 911 dispatcher failed to immediately send medical personnel upon being notified of the shooting.

Accordingly, the Ditters claim damages for Chase's wrongful death, including Chase's emotional trauma pain and suffering; loss of expected wages, services and contributions; funeral expenses and other economic damages; loss of society, comfort and companionship; and emotional distress suffered by Cory Ditter as a bystander.

Settlement Demand: $2,000,000.00

Very truly yours,

Adam J. Sipple
adam@sipple.law

12020 Shamrock Plaza, Suite 200 Omaha, NE 68154
402.778.5055





**UNITED STATES POSTAL SERVICE.**

BOYS TOWN
139 S 144TH ST
OMAHA, NE 68154-5300
(800)275-8777

01/31/2025                          03:17 PM

| Product | Qty | Unit Price | Price |
|---|---|---|---|
| First-Class Mail® | 1 | | $0.73 |
| Letter | | | |
| Columbus, NE 68602 | | | |
| Weight: 0 lb 0.70 oz | | | |
| Estimated Delivery Date | | | |
| Mon 02/03/2025 | | | |
| Certified Mail® | | | $4.85 |
| Tracking #: | | | |
| 9589 0710 5270 0011 7091 80 | | | |
| Return Receipt | | | $4.10 |
| Tracking #: | | | |
| 9590 9402 9263 4295 4289 50 | | | |
| Total | | | $9.68 |

Grand Total:                         $9.68

Credit Card Remit                    $9.68
  Card Name: VISA
  Account #: XXXXXXXXXXXX8542
  Approval #: 612289
  Transaction #: 703
  AID: A0000000980840        Chip
  AL: US DEBIT
  PIN: Not Required

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
1-800-222-1811.



# S I P P L E | L A W

August 7, 2025

Shuraya Choat
City Clerk
2500 14th St., Suite 3
P.O. Box 1677
Columbus, NE 68602-1677
CERTIFIED MAIL

***Re:    Tort Claim***
***Cory and Cheryl Ditter, Personal Representatives of the Estate of Chase Ditter***
***Date of Incident resulting in death*:  February 6, 2024**

Dear Ms. Choat:

Please be advised that Cory and Cheryl, in both their individual capacities as Chase's natural guardians, and in their capacities as Co-Personal Representatives of Chase's estate, hereby withdraw their previously submitted claims from consideration by the City's governing body. Said claims were submitted January 31, 2025.

After more than six months, the City has provided neither a response to the claims nor notice as to any final disposition thereof. Accordingly, the claims are withdrawn pursuant to and in accordance with *Neb Rev Stat* §13-906. The Ditters withdraw their claims with the intent to initiate suit.

Very truly yours,

Adam J. Sipple
adam@sipple.law

12020 Shamrock Plaza, Suite 200 Omaha, NE 68154
402.778.5055